**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,**

v.

**Rebecca C. URIBE, Appellee.**

**No. 16038.**

Court of Civil Appeals of Texas, San Antonio.

June 6, 1979.

Opinion on Order of Affirmance Nov. 7, 1979.

Rehearing Denied Nov. 7, 1979.

Second Rehearing Denied Jan. 11, 1980.

Third Rehearing Denied Feb. 20, 1980.

Bruce D. Viles, Wood, Burney, Nesbitt & Ryan, Corpus Christi, for appellant.

George P. Kazen, Mann, Freed, Kazen & Hansen, Laredo, for appellee.

## OPINION

CADENA, Chief Justice.

This is a suit by plaintiff, Rebecca C. Uribe, to recover accidental death benefits under two insurance policies which were issued by defendant, Prudential Insurance Company of America, on the life of plaintiff's deceased husband, Marco A. Uribe, who died as the result of injuries received

in an airplane crash. Defendant appeals from a judgment, based on the verdict of the jury, granting plaintiff recovery of accidental death benefits as well as attorney's fees.

It is undisputed that the death of the insured resulted, directly and independently of all other causes, from accidental bodily injury. Defendant's refusal to pay accidental death benefits is based on policy provisions excluding coverage if the death resulted from injuries received during "travel or flight in or descent from any kind of aircraft, except as a passenger with no duties whatsoever aboard such aircraft while in flight." In answer to Special Issue No. 1 the jury found that "on the occasion in question" "Uribe was a passenger with no duties whatever aboard the aircraft while in flight."

By its first six points defendant challenges the legal and factual sufficiency of the evidence to support the jury's answer to Special Issue No. 1.

It is undisputed that Uribe died as the result of injuries sustained in the crash of an aircraft during take-off from a dirt landing strip on a ranch, located about 55 miles from Laredo, Texas. The ranch was located in Mexico and was owned by Emeterio Flores. At the time of the accident the only other person aboard was Arturo Garza, who was also killed.

On the morning of the accident Uribe ascertained, by means of a telephone call, that Gateway Aviation, which had its place of business at Laredo Municipal Airport, had available for rental· a small single-engine aircraft. Later, Uribe and his friend, Garza, arrived at the airport, at which time they were told that the plane would have to be rented by Garza, who had been a licensed pilot for more than ten years, since Uribe held only a student pilot's certificate. After discussing the possibility of using Garza's private aircraft, which was hangared at Gateway Aviation, Uribe and Garza decided that they would use a plane rented by Garza.

Because the purpose of the trip required the crossing of the boundary between the United States and Mexico, under applicable regulations of the Federal Aviation Administration (FAA),[1] Garza, as the only licensed pilot aboard the airplane, was the "pilot in command" of the aircraft during the flight. § 61.89(a)(5). That is, Garza was the person responsible for the operation and safety of the aircraft during the flight. Except for the regulation, which will be discussed later, prohibiting the performance of duties aboard an aircraft by one who has recently consumed any alcoholic beverage, there is nothing in the regulations which would have precluded Uribe from acting as pilot at some stage of, or during the entire, flight.

The record furnishes no clues concerning the activities of Uribe and Garza aboard the aircraft during the flight into Mexico, nor is there any evidence indicating any agreement or understanding between Uribe and Garza concerning their activities aboard the aircraft during the flight.

After the parties landed at the Flores ranch they had lunch with Flores, who was a friend of both Uribe and Garza. During the meal Uribe drank a bottle of beer, while Garza had a soft drink. After lunch Flores and some of his friends drove Uribe and Garza to the aircraft and then drove to a nearby hill to watch the take-off. Flores was the only eyewitness who testified concerning the crash.

It is agreed that Uribe's death resulted, directly and independently of all other causes, from accidental bodily injury and that the policies in question were in force at the time of the crash and Uribe's death.

## I. POINTS RELATING TO THE SUFFICIENCY OF THE EVIDENCE

In considering a "no evidence" point, we must view "the evidence in its most favorable light in support of the [chal-

---

1. All references to regulations of the Federal Aviation Administration are to corresponding sections in 14 C.F.R. (1978).

lenged] finding of . . . fact, considering only the evidence and the inferences which support the finding, and rejecting the evidence and the inferences which are contrary to the finding." Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361, 364 (1960). Defendant's "insufficient evidence" points, however, require that we consider and weigh all of the evidence in the case, not merely that which supports the challenged finding, and determine whether, under all the evidence, it can be said that the finding is in accordance with a preponderance of the evidence. *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

An evaluation of the evidence in this case also requires that we determine the effect of the "presumption of innocence" on which plaintiff relies. This problem will be discussed separately.

#### A. *"No Evidence" Points*

Viewing the evidence under defendant's no evidence points, the applicable testimony may be summarized as follows:

1. Uribe began taking flying lessons on April 5, 1972. He received instructions, on a somewhat irregular basis, from that period until October 10, 1972. During that period he had completed one solo flight, and received credit for about 30 hours of flying time, including solo flight and flights during which he was accompanied by an instructor. A student pilot does not actually operate the aircraft at all times when he is in the air in the company of an instructor. When the instructor accompanies the student the instructor operates the aircraft for a portion of the time in order to demonstrate various flight techniques to the student. Uribe had not operated an aircraft, either alone or accompanied by an instructor during the period of more than ten months preceding the accident.

2. Garza, who was not a flight instructor, was a licensed pilot with more than ten years' experience.

3. The runway on the Flores ranch was a bumpy dirt strip. It is more difficult to take off from such a strip than from a paved runway because it is more difficult to attain the speed required to permit the aircraft to become safely airborne. Uribe had never attempted to take off from or land on any runway other than those located at Municipal Airport in Laredo.

4. After Uribe and Garza entered the airplane prior to take-off, Flores and his friends drove to a small hill near the runway to watch. When the aircraft passed in front of Flores, Uribe, who was sitting on the left side of the cockpit, turned to the left and gave Flores a "quick wave." At that time, the craft had reached an altitude of about 20 feet. According to Flores, who had piloted aircraft in the past, the plane "simply came down" and, after it hit the runway, rolled into some diesel tanks which were located near the end of the runway. The plane then burst into flames. Flores heard no change in the sound of the engine, nor did he observe anything which indicated to him the cause of the crash.

5. Flores and his friends rushed to the burning aircraft and saw Garza emerge from the right side, followed by Uribe. Both men were enveloped in flames which Flores and his companions extinguished by rolling the men on the ground and wrapping them in blankets. They then placed the injured persons in a pickup truck to take them to the hospital. During the trip to the hospital, Garza, who was sitting in the cab next to Flores, told Flores, "The airplane did not respond to me." Garza died without commenting further concerning the accident.

6. According to his instructor, Uribe manifested a "serious" attitude about flying and had "respect" for airplanes. (Defendant's objections to this evidence were properly overruled, for reasons which we will discuss in dealing with defendant's points concerning admission and exclusion of evidence.)

The evidence, when thus selectively viewed, cannot be characterized as furnishing no support for the conclusion that Garza, not Uribe, was piloting the aircraft.

Garza's statement that the craft did not respond to him cannot be described as no evidence that Uribe was not acting as pilot. Bearing in mind the presumption that a person acts with due regard to his own safety, the fact that Uribe turned and waved to Flores also supports the conclusion that he was not the pilot, since his nonchalant attitude during a critical stage of the flight is inconsistent with the fact that he was at the controls.

Defendant's contention that evidence which merely supports a finding that Uribe was not the pilot does not establish that he was a "passenger with no duties whatever to perform" will be considered in connection with our discussion of the presumption of innocence and its effect in this case.

### B. *"Insufficient Evidence" Points*

The evidence on which defendant relies to support the inference contrary to the jury's finding is as follows:

(1) The aircraft in question has only two seats in the cockpit, side by side. Although it has dual controls, the arrangement of some of the controls and of the instruments clearly indicates that the plane was designed so that it could be more efficiently operated by the person occupying the seat on the left. This was the seat which Uribe was occupying during the attempted take-off.

(2) When two persons, both of whom are competent to operate the aircraft, are aboard such a plane, it is customary for them to alternate as pilot.

(3) If the pilot of an aircraft turns to his left and waves with his right hand to a person on the ground, this action tends to cause his left hand, which remains on the control wheel, to pull back on the controls, raising the nose of the aircraft and tending to cause it to assume a "stall attitude" which could result in a crash.

(4) The records of the military hospital at which Uribe was treated contain the statement that Uribe was injured when the plane which "he was piloting" crashed at take-off. Hospital rules require that if a statement entered in the records was not within the personal knowledge of the person making the entry and if the information was not obtained from the patient the record must then reflect that the information was obtained from a third party. The record contains nothing indicating that the statement that Uribe was the pilot was based on information obtained from a third person.

Defendant also points out that Uribe, being a student pilot, could be assumed to be anxious to acquire credit for additional flying time and therefore, would want to take over the controls of the aircraft at some stage of the flight.

▉ Even considering the testimony relied on by defendant, we find that the conclusion that Uribe was not piloting is supported by a preponderance of the evidence.

The witness who identified the hospital records containing the statement on which defendant relies admitted that the regulation requiring identification of information received from third parties was often violated by hospital personnel, and that such omission was not considered a "serious" violation.

The record in question was prepared by the administrative office, and the witness testified that such office obtained the information from the "Patient's Administrative Record" which is prepared by personnel in the admitting office at the time the patient is admitted to the hospital. However, the Patient's Administrative Record contains a statement that Uribe was a passenger. The statement that Uribe was the pilot was not inserted in the report on which defendant relies until 35 days after Uribe was admitted to the hospital. At best, the hospital records must be described as being contradictory with reference to Uribe's status aboard the aircraft.

The fact that Uribe, as a student pilot, would be anxious to take over the controls at some stage of the flight is, of course, no indication that he was at the controls during the attempted take-off. His hopes and anticipations are of little significance, since Garza was the person directly responsible for the operation of the airplane as pilot in

command and was the final authority as to all matters concerning the operation of the aircraft. There is no evidence indicating that Garza was anxious to allow Uribe to operate the aircraft, nor is there anything to indicate that the matter had been discussed by Uribe and Garza. The record contains no suggestion as to the intentions of Uribe and Garza concerning the operation of the aircraft during the flight.

Defendant argues that Garza's statement that the plane did not respond to him is of little probative force. The argument is that Garza, the vastly more experienced pilot, realized the presence of danger which Uribe did not recognize or to which Uribe was not reacting properly and attempted to remedy the situation by taking control of the wheel in an effort to avoid the impending crash. In effect, defendant would have us regard Garza's statement as conveying the information that when he recognized the danger he took over the controls but was unable to avoid the crash because the aircraft would not respond to his actions. Defendant is reading much into a simple statement which on its face and without editing strongly suggest that Garza was the pilot. In any event, it cannot be said that defendant's suggested inference is as reasonable as that which leads to the conclusion that Uribe was not the pilot.

There is no evidence that the custom as to which defendant's expert testified was known to either Garza or Uribe. There is no evidence that Uribe had ever flown with any other pilot except his instructor, and on those flights the purpose was specifically to allow Uribe to gain experience. The flight in question was not undertaken for such purpose. In any event, the expert witness on more than one occasion testified that he had not said that any person other than the pilot had "duties" relating to the operation of the aircraft.

The evidence concerning the effect which may follow if a person piloting the aircraft during take-off and occupying the seat on the left turns his head to the left and waves with his right hand has little or no probative value. There is no evidence that Uribe waved with his right hand. There is no evidence that the aircraft stalled or that the nose of the plane was at an improper angle. Flores testified that neither wing "dipped." Defendant's argument may be summarized as follows: If the pilot of an aircraft at take-off turns to the left and waves with his right hand, the plane may stall and crash. Uribe turned to the left and waved. The plane crashed. Therefore, Uribe was the pilot, although we do not know that he waved with his right hand and there is no evidence of any change in the attitude of the aircraft. Such reasoning is unpersuasive and the critical inference does not rise above the dignity of sheer speculation.

The fact that the aircraft was designed to be flown by the person sitting on the left is not controlling in view of the other testimony in the case. There is evidence that the plane can be flown from the right seat without assistance from the person on the left, and there is evidence that Garza had, in the past, actually flown a dual-control airplane while occupying the seat on the right.

### C. The Presumption of Innocence

Defendant argues that evidence which supports the conclusion that Uribe was not piloting the aircraft does not establish that Uribe was a passenger with no duties. Plaintiff counters this argument by relying on the presumption of innocence. Her argument is based on the fact that FAA regulations provide that no person may act as a crewmember aboard a civil aircraft during flight within eight hours after he has consumed any alcoholic beverage. § 91.11(a)(1). Since Uribe drank a bottle of beer shortly before the attempted take-off, and since, as defined in § 1.1, a "crewmember" is any person "assigned to perform duty in an aircraft during flight," plaintiff argues that the presumption supports the finding that Uribe was a passenger aboard the aircraft with no duties whatever to perform during the flight.

In *Republic National Insurance Co. v. Heyward*, 536 S.W.2d 549, 559 (Tex.1976), the Court said:

Even though the burden is still on the beneficiary to prove that insured was not engaged in criminal conduct which led to his death, he must be presumed innocent of any criminal conduct until some evidence to the contrary is produced. . . Like the presumption against suicide, this presumption of innocence would entitle the jury to find, absent any evidence to the contrary, [the] insured's death was not excluded from coverage . . . .

■ In some cases involving presumptions, the introduction of rebuttal evidence merely raises a question of fact to be resolved by the jury. The introduction of rebuttal evidence causes the presumption to disappear, as a required inference, but the facts on which the presumption is based remain to be considered by the jury and will support a finding of the existence of the presumed fact. This is true of the presumption that a letter properly addressed, stamped and mailed was delivered to the addressee. The jury may find delivery even in the face of evidence of non-delivery. *Sudduth v. Commonwealth County Mutual Insurance Co.*, 454 S.W.2d 196 (Tex.1970).

■ In other cases, the introduction of rebuttal evidence forces the party relying on the presumption to produce other evidence of the existence of the presumed fact. This is true of the presumption that the driver of a vehicle owned by defendant is the agent or servant of defendant and was acting within the scope of his authority or employment. *Robertson Truck Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 358–59 (Tex. 1971).

The result which is reached apparently depends on the relationship between the presumed fact and the fact or facts on which the presumption is based. In *Van Cleave*, the Court said that the facts on which the presumption of receipt of a letter rests furnish a basis "for a reasonable inference that the letter was received in the ordinary course of events," while "ownership of the truck and employment of the driver do not, by themselves, when rebutted by evidence, create the inference that the driver" was acting within the scope of his employment. 468 S.W.2d at 359.

Even if it be assumed that the presumption of innocence is like the presumption of agency and that the production of evidence of wrongful conduct must be met by additional evidence sufficient to support a finding of absence of wrongdoing, plaintiff in this case produced sufficient evidence to support the conclusion that Uribe was not the pilot of the aircraft.

Defendant argues that the introduction of evidence that Uribe was the pilot destroyed the presumption of innocence so completely that plaintiff had the burden of producing sufficient evidence to establish not only that Uribe was not the pilot, but also evidence sufficient to support a finding that he had no other duties to perform aboard the aircraft while in flight.

■ The presumption of innocence has the effect of forcing the party against whom it operates to "show his hand." In this case, the "hand" shown by defendant consisted of evidence that Uribe was acting as the pilot. Since this was the only hand shown by defendant, it was the only hand which plaintiff was required to meet and overcome.

Let us assume that a beneficiary, in order to recover under an accidental death policy, has the burden of showing that the insured was not engaged in unlawful conduct at the time of the fatal injury. Initially, the beneficiary is protected by the presumption of innocence and need only show that the death was accidental. The insurer then produces evidence that the insured was killed while committing an armed robbery. Must the beneficiary, in addition to producing evidence that insured was not committing an armed robbery, also produce evidence showing that he was not drunk, did not have narcotics in his possession, was not engaged in the commission of arson, burglary, rape, malicious mischief, and so on through the entire penal code? The question must be answered in the negative.

■ The presumption is that Uribe was not engaged in any wrongful conduct. Evidence that he was engaged in wrongful

conduct A does not rebut the presumption concerning wrongful conduct B, C and D. Plaintiff's burden would merely be to present evidence to support a finding of "not A." This she did.

## II. QUESTIONS CONCERNING THE CHARGE

■ Special Issue No. 1, as submitted to the jury, inquired whether Uribe was a passenger with no duties aboard the aircraft while in flight "on the occasion in question." Under point 7 defendant argues that the inclusion of the phrase, "on the occasion in question," improperly limited the scope of the inquiry and tended to mislead the jury into believing that it was limited to a consideration of "what . . . Uribe was doing at or immediately before the time of the crash." We do not agree.

The issue clearly concerns Uribe's status on the aircraft and cannot be interpreted as seeking information concerning the performance of any act or acts by Uribe at or before the accident. The issue was correctly phrased in the very language used in the policy. The relevant inquiry concerns Uribe's status at the time he sustained the fatal injuries, not his status on some prior or subsequent occasion. The issue submitted the controlling question and cannot be characterized as being merely evidentiary.

Point 8 is based on the refusal of the trial court to define, as requested by defendant, the word "duties" as follows:

> [T]he word "duties" refers to responsibility for the performance of an act or acts relating to the aircraft in question. It also includes within its meaning a responsibility to avoid injury to person and property in the air and upon the ground.

■ Words used in an insurance policy are to be given their ordinary and generally accepted meaning unless they are defined in the policy or the policy otherwise. shows that they were meant to have a technical or different meaning. *Guardian Life Insur-*

*ance Co. of America v. Scott,* 405 S.W.2d 64, 65 (Tex.1966). There is nothing in the policy which indicates that "duties" is used in any sense other than its commonly accepted meaning. In any event, what controls is not the interpretation of individual words which are not defined in the policy itself, but the interpretation which the ordinary man would give to the phrase as a whole, taken in the context of the whole policy. "Under such a test, a reasonable interpretation and probably *the most* reasonable interpretation of the provision involved is that it differentiates between those involved in the flying of airplanes and those not so involved." *Prudential Insurance Co. of America v. Barnes,* 285 F.2d 299, 301 (9th Cir. 1960) (emphasis original).

■ The requested definition is not substantially correct as applied to the policy in question. Even if it be assumed that the first sentence of the requested definition is not objectionable,[2] the second sentence renders the entire definition overly broad. The second sentence in no way connects responsibility to avoid injury to person or property with performance of acts relating to the aircraft. Every person has a responsibility to avoid injury to person or property. Under the suggested definition every person aboard an aircraft would have "duties" without reference to responsibility for the performance of acts connected with the operation of the aircraft. In any event, defendant did not object to the definition of "duties" which the court included in the charge.

Points 9, 10 and 12 concern the refusal of the trial court to give one of the three definitions of "passenger" requested by defendant.

■ The first suggested definition would have told the jury that "passenger" includes the person piloting the aircraft and that the pilot of an aircraft necessarily has duties aboard such aircraft while in flight. Defendant insists that such a definition is required because, as the Court pointed out

---

2. The required assumption is that "responsibility for the performance of an act or acts relating to the aircraft" refers to acts connected with the operation of the aircraft.

in *Continental Casualty Co. v. Warren*, 152 Tex. 164, 169, 254 S.W.2d 762, 764 (1953), "the mere word 'passenger' cannot be said to exclude the pilot . . . ." We are not persuaded that defendant was prejudiced by the failure of the trial court to tell the jury that "passenger" included the pilot and that a pilot necessarily has duties aboard the aircraft while in flight. As we understand defendant's argument, it is concerned lest the jury, believing that "passenger" excludes the pilot and believing that Uribe was the pilot, would be likely to conclude that Uribe, therefore, was not a passenger. It is inconceivable that a jury so misled would affirmatively find that Uribe was a passenger if it was convinced that he was the pilot. Nor do we believe that a person of at least ordinary intelligence has to be told that a pilot has duties aboard the aircraft.

Again, defendant too narrowly focuses on a single word in the exclusion. While it may be that the "mere word 'passenger'" cannot be said to exclude the pilot, the entire phrase, "passenger with no duties whatsoever aboard the aircraft while in flight" unequivocally excludes the pilot.

The second alternate definition requested by defendant was to the effect that "passenger" means an occupant of an aircraft but does not include a person who has any duties on or in connection with the aircraft while in flight. Giving this definition would serve no useful purpose since the issue, as submitted, required a finding of absence of duties. A definition of passenger as a person with no duties would be entirely superfluous. The second requested definition was properly refused.

The third definition defined "passenger" as "any person riding in an aircraft, but having no part in its operation." The trial court modified this requested definition by substituting the word "duty" for the word "part." We see no ground for reversal in such modification. If "part" and "duty" are synonymous, the substitution of the latter word for the former is irrelevant. If the terms are not synonymous, "part" has either a broader or a narrower meaning than "duty." If "part" has a broader meaning, the modification was required, because plaintiff's burden under the policy language was merely to negate the narrower term, "duty." If "part" denotes something less than "duty," the substitution benefited defendant since it required plaintiff to prove more than she would have been required to prove under the requested definition.

Point 11 complains of the action of the trial court in overruling defendant's objection to the definition of "passenger" included in the charge. The basis for the complaint is that the word "duty" was used instead of the word "part." This complaint is groundless for the reasons given in the immediately preceding paragraph.

## III.  EXCLUSION AND ADMISSION OF EVIDENCE

Points 13 through 20 concern rulings of the trial court relating to admissibility of evidence.

Defendant's expert witness was not allowed to testify that if the pilot of an aircraft turns his head to the left during take-off in order to wave, the natural reaction is for him to pull back on the wheel, causing the aircraft "to go up into a stall attitude."

Defendant's exhibit 21 is a slide which, according to the expert witness, shows what happens when a pilot turns to his left and waves. While exhibiting this slide to the jury, the witness explained that the act of turning to the left and waving "throws his shoulder out of position" so that it is "almost inevitable" that his left hand will come down and back. Plaintiff objected to such testimony and requested that the jury be instructed to disregard it. The objection was sustained, but the requested instruction was not given. Exhibit 21 was subsequently admitted in evidence.

Where an objection is made and sustained as to testimony which has been heard by the jury the testimony is before the jury unless the jury is instructed to disregard it. *Southwest Title Insurance Co.*

v. *Northland Building Corp.*, 542 S.W.2d 436, 447 (Tex.Civ.App.—Fort Worth), *aff'd in part, rev'd in part*, 552 S.W.2d 425 (Tex. 1977); *Poole v. State Highway Dep't*, 256 S.W.2d 168, 171 (Tex.Civ.App.—Fort Worth 1953, writ dism'd). The "excluded" testimony was, therefore, before the jury for their consideration.

The witness gave an affirmative answer to an inquiry concerning whether it was customary, when both persons aboard an aircraft such as the one here involved have flight experience, for the man on the left "to do anything" during the flight. After the question had been answered plaintiff successfully objected but did not request that the answer be stricken. As already pointed out, the answer was before the jury for its consideration. The witness then testified it was possible, under such circumstances, for both persons to share the flight duties and that this was frequently done. The witness was not permitted to testify that, when several persons are on board, it is customary for them to share navigation duties. The bill of exception reflects that the witness would have given the following testimony: (1) When two persons with flight experience are aboard an aircraft they ordinarily and customarily share flight duties, such as looking out for other airplanes. (2) It is usual and customary, when two persons aboard the aircraft have flight experience, for both of them to alternate in flying the aircraft.

■ Exclusion of the testimony developed in the bill of exception does not require reversal. The jury had before it for its consideration the statement that it was customary for the person sitting on the left, if he had flight experience, to do certain acts, and that in such situations both persons on board frequently shared the flight duties. The jury also had before it testimony that a person operating an aircraft from the seat on the right would often have to ask the man on the left for assistance. Testimony similar to that which was excluded was, in fact, before the jury. The case is easily distinguishable from *Whittemore v. Lockheed Aircraft Corp.*, 65 Cal. App.2d 737, 151 P.2d 670 (Cal.App.1944), where the ruling of the trial court prevented admission of *all* testimony that the man acting as pilot customarily occupied the seat on the left.

■ The trial court also excluded a copy of the report of the Mexican governmental agency which investigated the accident. This report contains the statement that Uribe was the pilot of the aircraft. It shows on its face that the conclusions stated in the report were based on hearsay. After plaintiff's objection was sustained, defendant deleted "anything that might be considered hearsay" and offered the remainder of the report in evidence. Again, plaintiff's objection was sustained.

Neither Article 3731a nor Article 3737e, Tex.Rev.Civ.Stat.Ann. (Vernon Supp.1978–1979), authorizes the introduction of reports based on hearsay. *See Smith v. Riviere*, 248 S.W.2d 526 (Tex.Civ.App.—Texarkana 1951, no writ). "Furthermore, the admissibility of the records does not authorize the consideration of any hearsay based on hearsay, or of any conclusion therein which is not shown to have been made by an official or employee . . . who had personal knowledge of the facts upon which the conclusion is based." *Texas Dep't. of Public Safety v. Nesmith*, 559 S.W.2d 443, 447 (Tex.Civ.App.—Corpus Christi 1977, no writ).

Article 3731a, Section 3, makes governmental records admissible only "if the party offering it has delivered a copy thereof . . . to the adverse party a reasonable time before trial." Defendant does not contend in its brief, nor does the record reflect, that this requirement was met.

Uribe's flight instructor testified that he knew in his own mind that Uribe would not have flown "under those circumstances." Although defendant's objection to the statement was at first overruled, the trial court thereafter granted defendant's motion that the statement be stricken and instructed the jury to disregard it. This incident presents no ground for reversal.

Uribe's flight instructor further testified that Uribe had a profound respect for airplanes. Although defendant objected to the answer, the court did not rule on the objection and defendant did not ask that the jury be instructed to disregard it. Under such circumstances there was no error.

There was no objection to the testimony that Uribe was a serious-minded student. In any event, a witness who has observed the conduct and demeanor of another may testify by describing it in general terms without stating in detail the facts upon which the description is based. 2 C. McCormick & R. Ray, Texas Law of Evidence § 1429 at 275–6 (2d ed. 1956). In this case the testimony of the witness was based on his observations, as Uribe's flight instructor, on Uribe's conduct and reactions while the witness was aboard the aircraft with Uribe and on the observation of Uribe's conduct at all times during the instructional period.

The same witness, in response to a question, agreed that if the man in the right seat is "doing everything" there is nothing for the man in the left seat to do "as a matter of duty . . . just because he is sitting in the lefthand seat." Defendant unsuccessfully objected that the question of duty was one of the questions in the case; that the answer was no more than the opinion of the witness as to a question of law or mixed question of law and fact; and that the testimony consisted of speculation.

Defendant's position is based on the assumption that the word "duties" in the contract of insurance is used in some esoteric legal sense. This assumption is contrary to the well-established rule that words appearing in an insurance policy are to be given their ordinary and generally accepted meaning, unless such words are defined in the contract or the policy shows that the words were meant in a technical or different sense. *Guardian Life Insurance Co. of America v. Scott*, 405 S.W.2d 64, 65 (Tex. 1966).

It is frequently said that an expert witness may not "invade the province of the jury" and that such witness may not give his opinion upon an ultimate issue in the case. The notion expressed in such rule, or rules, probably finds its strictest application in negligence cases, where courts will not permit an expert to testify that a party acted as an ordinary prudent man would have acted under similar circumstances. *See Snow v. Bond*, 438 S.W.2d 549 (Tex. 1969). However, there are many cases in which an expert has been permitted to testify concerning an ultimate issue and thus invade the province of the jury. Some of these instances are set out in *Houston & T. C. R. Co. v. Roberts*, 101 Tex. 418, 108 S.W. 808 (1908), where the court distinguished between cases where the issue to be determined by the jury involved a pure question of fact and cases where the jury was asked to determine a mixed question of law and fact.

The result is that a witness may not testify to an opinion or conclusion which contains matters of law. On mixed questions of law and fact the jury, after being properly instructed by the court as to the law, can draw the required conclusion from the facts as well as can the expert, so that the opinion of the witness, be he expert or layman, is superfluous in the sense that it will be of no assistance to the jury. *See* 7 J. Wigmore, Evidence § 1918 (3d ed. 1940); McCormick, *Some Observations Upon the Opinion Rule and Expert Testimony*, 23 Texas L.Rev. 109 (1945).

Unless we are to give to the word "duties" a special legal meaning, it is difficult to find that the testimony to which defendant objected contained a legal conclusion. The ordinary concept of "duty" is easily understood and given content by the community at large. The witness, because of his experience, was in a better position to know what conduct is required of persons aboard an aircraft to facilitate safe operation of an aircraft. Taking the testimony of the witness as a whole, there was no danger that the jury would fail to understand the sense in which the witness used the term. The mere fact that, in certain situations, the courts have given a certain

meaning to words which do not have a technical meaning among laymen should not result in exclusion of testimony in cases in which the technical legal meaning of the words is irrelevant.

In any event, the testimony cannot be said to have affected the verdict. The actual testimony, giving to it its strongest possible meaning, was that when two persons are riding in a dual-control aircraft which is being flown by the person occupying the seat on the right, the person sitting on the left has no duty simply because he is seated on the left. It cannot be argued that, absent such testimony, the jury would have concluded that occupying the seat on the left in and of itself imposes duties on the occupant.

Points 21 through 24 are overruled.

## IV. MISCONDUCT OF COUNSEL

Points 21 through 24 relate to asserted misconduct by counsel for plaintiff.

After the jury verdict had been received, but before the jurors were dismissed, the court, without objection by counsel for defendant, told the jurors they were free to discuss the case and their deliberations with anyone and that it was a "function" of the attorneys in the case to talk to jurors concerning possible jury misconduct. The court added that the attorneys could request jurors to sign affidavits concerning their deliberations, but that the jurors were free to discuss or not discuss the matter and had the right to refuse to give affidavits. See Rule 226a, Tex.R.Civ.P.

After the court had given the jury such instructions, counsel for plaintiff reminded the jurors that the court had told them that they had a right to say, "I don't want to talk about that." He said that "normally," if they discussed their deliberations, it would lead to a request that they sign a statement and give an affidavit. After stating that "it's not criticism," he told them that the purpose of interrogation of jurors by counsel "is to try to see if you did something wrong so that the verdict would be set aside."

There is no reason to believe that the remarks of plaintiff's attorney would make any greater impression on the minds of the jurors than the information or instructions previously given by the court. Although defendant argues that the remarks of counsel for plaintiff were clearly calculated to and did destroy any reasonable possibility of defendant's engaging in any candid conversation with the jurors, the statement of the trial court would clearly have the same effect. In any event, there is nothing in the record to indicate that defendant made any effort to question jurors concerning possible misconduct and that the jurors refused to discuss the matter. No injury is shown.

While plaintiff was presenting evidence by means of a deposition, her counsel read a question to which defendant objected on the ground that it was a leading question. After the court had overruled the objection, plaintiff's counsel said that he would like the record to show that defendant's attorney "made it a point. . . ." Before plaintiff's counsel could finish his statement, defendant's attorney interrupted and suggested that the matter be discussed at the bench. The attorneys and the court reporter then approached the bench and counsel for plaintiff said that, when the deposition was being taken, defendant's counsel insisted that objections to the form of questions were waived unless made while the deposition was being taken. He added that after the court reporter had typed the depositions defendant's attorney insisted that the first page be retyped to reflect such agreement. Defendant's counsel replied that he did not recall requesting that the court reporter retype the first page.

The discussion took place at the bench, as defendant's counsel requested. It is clear that defendant's attorney was aware of the exact nature of the statement which plaintiff's counsel was preparing to make. Even if it be assumed that the jury overheard the discussion at the bench, where it was held in compliance with defendant's request, defendant made no objection nor did he request that the jury be instructed to disre-

gard the remarks of plaintiff's attorney. We do not agree that the statements made by plaintiff's attorney were so inflammatory that their effect could not have been erased by a proper instruction.

During the presentation by plaintiff of deposition testimony, her attorney pointed out to the court that an answer, as originally transcribed by the reporter, had been expanded by the witness before he signed the deposition. He then read both answers. When this occurred the second time defendant's counsel said, "Wait a minute, read it as it is, then he can go back if he wants to." Plaintiff insisted that the jury was entitled to know that the witness "originally answered certain things, and later on when he signed it added other things, and . . . what part he said at one time and what part he added." Defendant, saying that he did not question plaintiff's right "to do that," added that "the deposition is to be read the way it is, and then if he wants to show that the witness made a change for clarification, he can do that." The court instructed counsel for plaintiff to read "the typewritten stuff first" and then "read the handwritten stuff."

It is clear, as defendant informed the court, that all changes made by the witness were made for the purpose of "clarification." Defendant's complaint was that the proper procedure was to read into evidence the answer of the witness as clarified by the handwritten addition, and then to read the answer as it appeared prior to the "clarification." Defendant clearly stated that he did not question the right of the jury to hear both answers.

█ We are inclined to agree that the method suggested by defendant would have made for a more orderly procedure, but we cannot hold that the procedure followed at the suggestion of the court resulted in harm to defendant. In every instance the fact that the witness had changed his answer was made clear. We do not agree that the procedure followed tended to confuse or mislead the jury, or that it suggested that the witness, in clarifying his answer, had done anything improper. We do not decide

whether, in the face of a proper objection, it would have been error to permit the reading of the answer as it originally appeared in the deposition prior to the change made by the witness. Defendant's complaint was as to the order in which the answers were read. We see no ground for reversal.

Defendant urges that we follow the holding in *Sherwood v. Murray*, 233 S.W.2d 879 (Tex.Civ.App.—El Paso 1950, no writ) and reverse the judgment below because the record does not affirmatively reflect that no prejudice resulted to defendant from the procedure followed. Perhaps the now generally discredited rule of presumed harm championed in *Golden v. Odiorne*, 112 Tex. 544, 249 S.W. 822 (1923) is occasionally applicable where, as in *Murray*, the error consists of improper jury argument which is, on its face, inflammatory to a significant degree. But in view of the clear provisions of Rule 434, Tex.R.Civ.P., which were not mentioned in the *Murray* opinion, we decline defendant's invitation to apply it in this case.

## V.  MISCONDUCT OF COURT

Point 25 concerns the action of the trial court in "admonishing" counsel for defendant during cross-examination.

At one point there was a rather lengthy exchange between the court and defendant's attorney concerning the scope of cross-examination of one of plaintiff's witnesses whose testimony was that, as part of Uribe's flight training, he was required to become familiar with FAA regulations. The court stated that counsel was entitled to question the witness concerning the extent of Uribe's knowledge of the regulations, but told him "not to scout around the airport backward and forward." The court added that counsel would be given some leeway but that he would not be permitted to "go through the book." After counsel explained that he would cross-examine concerning only the pertinent parts of the regulations, the court again said he was giving counsel some leeway but that counsel should not "abuse it." The court then said, "Go ahead."

At this point counsel asked permission to approach the bench and the attorneys for the parties and the court reporter went to the bench. To counsel's statement that he was merely attempting to exercise his right of cross-examination, the court replied that he recognized such right and then inquired whether such right gave counsel the right to take a week or two weeks to "go through this book." Counsel stated he wished the record to show that the court was "speaking loud enough for the jury to hear," and the court said that he would "whisper." The court agreed that he was admonishing counsel but denied that he was suggesting that counsel was doing anything "improper," saying he was merely asking that counsel limit his cross-examination and not "go through those books" so that the cross-examination would not take two or three weeks.

Counsel did not ask that the court instruct the jury to disregard the court's remarks.

▆▆▆▆ The right of cross-examination is essential to the proper functioning of our adversary system. Judges should make no remarks calculated to excite prejudice or hostility in the minds of the jurors toward counsel. However, the court cannot be denied the right to inquire concerning the purpose of a line of questioning, even during cross-examination, since he must be granted considerable discretion in controlling the orderly progress of the trial. Perhaps the court in this case should have chosen its words more carefully, but although the court's remarks reflected a degree of impatience and an unwillingness to tolerate protracted questioning concerning irrelevant matters, the remarks did not amount to an attribution of misconduct to counsel and present no ground for reversal. See Hill v. Budget Finance & Thrift Co., 383 S.W.2d 79, 83 (Tex.Civ.App.—Dallas 1964, no writ).

We do not agree that the "cumulative effect" of the events described in the discussion of points 21 through 25 is such as to reflect that defendant was denied a fair trial. Point 26 is without merit.

## VI.  ATTORNEY'S FEES

Defendant's last 12 points concern the award of attorney's fees. We shall consider only those points questioning the sufficiency of the evidence and complaining of the excessiveness of the award.

In answer to Special Issue No. 2 the jury found that $11,666.66 represented the "reasonable amount of attorney's fees incurred" by plaintiff "through the time that a final judgment is entered in the trial court." In response to Special Issue No. 3 the jury found that "the reasonable amount of attorney's fees which will be incurred by the plaintiff" in the event of an appeal would be $14,000.00. Based on these findings, the judgment awarded plaintiff attorney's fees in the sum of $14,000.00, with a provision for remittitur of $2,333.44 if the case was not appealed.

In her original petition plaintiff sought recovery of attorney's fees and alleged that $10,000.00 was a reasonable fee in this case. On the third day of the trial, immediately before plaintiff rested, one of her attorneys testified that, as of that time, he had devoted a total of 80–85 hours in preparation and prosecution of plaintiff's claim and added that this estimate of time did not include work done by his co-counsel. He described his contract with plaintiff as a contingent fee contract calling for payment to him of ⅓ of the amount recovered with provision for a fee of 40% of the amount recovered if the case was appealed, and he described the contract as reasonable.

Oscar J. Pena, a practicing attorney in the area since 1959, testified that the contingent fee arrangement described by plaintiff's counsel was fair and reasonable in a case of this nature and was the standard arrangement for determination of attorney's fees payable to plaintiffs' attorneys in cases like the one before us. He further testified that he knew of no instance in which a plaintiff's attorney in the area handled such a case under any other form of fee agreement, although attorneys representing insurance companies in such cases

were customarily compensated on an hourly basis.

Article 3.62, Tex.Ins.Code Ann. (Vernon 1963), authorizes recovery of "reasonable attorney fees" by plaintiff in a case of this nature. In *Southland Life Ins. Co. v. Norton*, 5 S.W.2d 767, 768 (Tex.Comm.App.1928, holding approved), the court said, by way of dictum, that the statutory forerunner of what is now Article 3.62 of the Insurance Code contemplated the recovery of "such a fee as would be reasonable for a litigant himself to pay his own attorney for prosecuting the case, and not a speculative or contingent fee based upon the uncertainty of the litigation." In *General Life Ins. Co. v. Potter*, 124 S.W.2d 409, 410–11 (Tex.Civ. App.—Eastland 1939, no writ), it was held, as the basis for finding that evidence that a contingent fee contract was reasonable should not be admitted, that the statute does not authorize recovery of a reasonable contingent fee based on successful prosecution of the case. In *Smith v. Davis*, 453 S.W.2d 340, 347–8 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.), the only evidence on the question of attorney's fees was the testimony of an attorney who stated that a contingent fee contract calling for a fee of between ⅓ and 40% of the amount recovered would be reasonable. The court held that this was "no evidence" on the question of reasonable attorney's fees and that the trial court erred in overruling defendant's motion to disregard the jury's answer to the issue relating to attorney's fees.

*Smith* involved a provision for payment of reasonable attorney's fees contained in a promissory note, rather than Article 3.62 of the Insurance Code. However, the court defined the phrase " 'reasonable attorney's fees'," as used in the note, as " 'such a fee as would be reasonable for a litigant himself to pay his own attorney for prosecuting the case, and not a speculative or contingent fee based upon the uncertainty of the litigation.' " 453 S.W.2d at 347. That is, it applied the same definition as that given in *Norton* and *Potter*.

■ We agree with defendant that the evidence concerning the reasonableness of the contingent fee contract is "no evidence" supporting the jury's answers to issues 2 and 3.

The only other evidence relating to reasonable attorney's fees was also given by Pena. On cross-examination, when asked about compensation when an attorney is paid on an hourly basis, he answered, "The last I heard about the hourly rate basis was $50.00 per hour." He then agreed that "at $50.00 an hour" an attorney who "spent 80 to 85 hours" on a case would be paid "$4,000.00 to $4,500.00 for his services." But he testified that, "from the plaintiff's side," $50.00 an hour would not be a reasonable fee "because there's an element of risk" involved. He said this case involved technical problems and in his opinion, an attorney who agreed to represent a plaintiff in a case like the one before us for a fee based on $50.00 an hour "wouldn't come out."

The testimony is that $50.00 per hour would not be reasonable because it is insufficient compensation. Stated differently, the witness testified that a reasonable fee would be more than $50.00 per hour. Such testimony clearly supports an award based on compensation at the rate of $50.00 an hour and, in view of the testimony, such award could not be considered excessive. It is inconceivable that a party complaining of a judgment against him for attorney's fees could successfully argue that the judgment must be reversed because the award is unreasonably low.

■ There is, therefore, some evidence on the question of reasonable attorney's fees, at least insofar as the 80–85 hours are concerned. However, in view of the testimony, it is clear that the award of $11,-666.66 is grossly excessive.

We find nothing in the record to support any award for attorney's fees in the event of an appeal. There is nothing in the record which suggests the amount which would be reasonable should the case be appealed. The motion to disregard the answer to Special Issue No. 3 should have been granted.

We conclude that the award of attorney's fees is, under the evidence, excessive by the amount of $9,500.00.

The judgment of the trial court is affirmed on condition that plaintiff file a remittitur in the amount of $9,500. Such remittitur must be filed not later than 5:00 p. m. on June 21, 1979, or, in case a motion for rehearing is filed, not later than 5:00 p. m. on the 15th day following the date of final action by this Court on such motion. In the absence of such remittitur, that portion of the judgment awarding attorney's fees will be reversed and remanded to the trial court.

### OPINION ON ORDER OF AFFIRMANCE

This court previously entered judgment affirming the judgment of the trial court in this case on condition that appellee, Rebecca C. Uribe, remit a portion of the attorney's fees awarded her by the judgment below. Appellee has timely filed that remittitur. Consequently, it is the order of this court that the judgment of the trial court be affirmed.