## AMERICAN CENTRAL LIFE INS. CO. v. ALEXANDER. *

### No. 3606.

Court of Civil Appeals of Texas. Amarillo. April 29, 1931.

Rehearing Denied May 27, 1931.

Douglas & Spiller, of Lubbock, for appellant.

R. A. Baldwin, of Slaton, for appellee.

RANDOLPH, J.

Mrs. Alexander sued the American Central. Life Insurance Company on a life insurance policy issued by said company upon the life of her husband, Chester Lloyd Alexander, for $1,000 face of the policy, $1,000 under the double indemnity clause of same, interest, 12 per cent. penalty, and reasonable attorney's fees.

The insurance company defended on the ground that the insured committed suicide and further pleaded a misrepresentation by the insured, to which latter plea the plaintiff excepted and the trial court sustained said exception.

The jury, in response to special issues, found that the insured did not intentionally kill himself, and that $750 was a reasonable attorney fee, and on these findings the trial court entered judgment in favor of appellee for $3,067, being $2,000 on the policy, $77 interest, $240 penalty, and $750 attorney fees, and from this judgment appeal is had to this court.

The appellant insists that the evidence excludes every other reasonable hypothesis. than that the insured committed suicide; that there is no evidence upon which to base a contrary conclusion; and that, as the burden was on appellee to prove accident, it was entitled to an instructed verdict.

We will proceed with the discussion of the evidence to determine these questions.

The deceased was a married man, approximately thirty years old at the time of his death. He was an employee of a wholesale grocery company and was a stout healthy man. From the testimony of his employer, it appears that the deceased had been working for him for four years and was in no danger of losing his job. The evidence also

*Writ of error granted.

discloses that he was a genial pleasant man and was not of the gloomy or morose type. There is nothing in the record which discloses that he ever had any financial or marital trouble or any other troubles which would furnish a motive for his committing suicide.

On the day of his death, deceased went home to his noon meal. He also went home at his usual time about 6 o'clock in the afternoon and carried some groceries, but did not eat supper, as he said he had something down in town. At noon he asked his wife to have a tank of hot water for him to take a bath that night, and when he came home at 6 o'clock his wife asked him if he did not want his bath and he said he would be back in a short time to take his bath. He did not usually stay out late at night, but on this occasion he did not come home until about 1 o'clock.

After he returned to town from home that night, his whereabouts up until 1 o'clock were accounted for only up to 9 o'clock. A man by the name of Williams, who was engaged in the transfer business in Slaton, testified that the deceased came to his place of business about 7 o'clock or 8 o'clock, between sundown and dark, and, when he came in he had some liquor with him, a small flat bottle which the witness thinks was a half-pint bottle, from which they took a drink. They talked quite a while and then went over to the skating rink, but before leaving his (Williams) place of business they took another drink. The witness testified that he "killed the bottle." He further testified that he never took more than three drinks with deceased in his life. When deceased came to witness' place, he acted as he usually did, was jovial and friendly. The witness at that time, at the time deceased came to his shop, did not smell any whisky on his breath. When they arrived at the skating rink, he (the witness) put on skates and saw deceased no more.

The witness Selman owned and ran the skating rink and was also constable. When Williams and deceased came to his rink, he saw deceased, who did not skate any. Deceased called to him "Hello Sam." In about three or five minutes deceased came to where he was and asked him how his business was getting along and remarked, "You have a nice crowd here tonight." The witness testified he told deceased to go over and put on skates and deceased said, "I am going to get it done tonight." This was about 9 o'clock. The witness noticed nothing unusual in deceased's conduct, he was just in a jovial jolly mood, the same as usual. There is some controversy as to what the deceased said, but the witness testified to the expression above quoted.

The deceased's whereabouts were not accounted for from that time until he arrived home about 1 o'clock. When he arrived at home the testimony of his wife gives a clear account of what transpired. She testified, in substance and in part, that when her husband got home she unlocked the door and let him in and when he got in he went to his trunk, prowling around in his trunk, and appeared to be hunting for something. The trunk was in front of the door leading from the living room. The house faces west, had the living room on the northwest, bedroom on the south, and bedroom on the east, with bathroom between the two rooms, having doors connecting with each. The north side of the house, east of the living room on the north, were the dining room and kitchen. She asked him what he was hunting for and he said, "I am hunting for my ducks." She told him there were no ducks in there. He then went through the bedroom door into the bath, then into the back bedroom and she followed him, and found him at the closet in the back bedroom. There was a shotgun and a rifle in there. He took out the shotgun and leaned it over, then picked up the rifle, opened it and looked in it, and then set it back. Then he picked up the shotgun, breached it, and looked into it. She then asked him, "What in the world are you doing?" He replied, "I am hunting my ducks and you won't tell me where they are at," and she said to him, "Come on and let's go to bed." He then said, "You know where my ducks are but you won't tell me." She told him, "They are your Daddy's ducks that you are talking about. Put them back and let's go to bed." He put both guns back. He then went and leaned against the bathroom door and cried and said that she knew where his ducks were but would not tell him. She again told him to come and go to bed. He went through the back into the front bedroom and she heard a shot and ran in there and he was lying on the floor. It appears that his pistol was in a closet lying on a high shelf. When other parties found him he was lying on his back, his feet were near the closet door, his pistol lying on one side of him and the scabbard on the other side. He had a bullet wound on the right side of the head, ranging down toward the left side, but the bullet had no exit, having lodged in the back of his head, low down.

There was another wound on his head which cannot be and is not accounted for. There are several circumstances urged by each party to sustain their version of suicide and accident, but we will consider only one of them. There was only a slight powder burn where the bullet entered. The doctor who shaved the hair from around the wound so testified.

It is clear from the evidence that the deceased had no motive for suicide. Whether or not he killed himself with suicidal intent

was a question submitted to the jury, which was answered in the negative.

In explanation of his calling for his "ducks," the plaintiff proved by the deceased's father, who was a farmer in the neighborhood of Slaton, that large numbers of wild ducks had been destroying his crops, and that he had arranged with the deceased to come out and help him kill them. Further, it is the contention of the plaintiff that the other wound in his head or on his head and unaccounted for, had been received by him before he reached home, and that he appeard at home semiconscious only from the effect of that wound.

■■ The rules governing the disposition of the questions in this case are clearly and thoroughly discussed by this court in the case of United Fidelity Co. v. Adair, 29 S.W. (2d) 940, and by the Commission of Appeals in the same case in 29 S.W.(2d) 944, and we follow the principles laid down therein. By reference to those decisions we avoid the necessity of an extended discussion of the law in this case. We will say, however, that the burden is on the appellant to sustain its defense of suicide, and that the deceased intentionally took his own life and this it has not done by excluding every other reasonable hypothesis except that of suicide.

The appellant presents the following proposition of error on the part of the trial court: The insurance company, not being required, under the law, to give notice that it will not be bound by the policy in order to avail itself of the defense of misrepresentation in the application, the trial court erred in sustaining an exception to its pleading setting up that defense, and the answer of the insurance company that representations were made in the application which were false and which induced the company to issue the policy, and that the company would not have issued the policy had it known of the falsity —the misrepresentations alleged were material to the risk, and the court committed error in sustaining the exception to the allegations of said answer.

·The answer of the insurance company contains the following allegations as to the misrepresentations in the application of the deceased for insurance:

"The defendant would show that it is not liable on said policy because of the following facts: prior to the issuance of the same the said Chester Lloyd Alexander submitted to the plaintiff, through its duly authorized agent, G. W. Bounds, an application for the issuance of the policy sued upon, which application was duly signed by the said Alexander, and among other things contained the following:

" 'Declarations of applicant in lieu of medical examination:

" 'In continuation of and forming a part of my application to the American Central Life

Insurance Company, I declare that the statements and answers herein are complete and true without exception.

" '(a) To what extent do you use alcoholic beverages? None.

" '(b) Have you ever used them to intoxication? No.'

"That the said application containing the above language and representations by the said Alexander was presented to the defendant herein and was the basis of the issuance of the policy to the said Alexander, and that the declarations hereinabove quoted and alleged were believed by the defendant herein and relied upon by it in the issuance of said policy; the defendant would show that said answers are false, and especially· the answer to the question 'To what extent do you use alcoholic beverages?'; for the reason that the said Alexander for a long time prior to and after the making of said representations did use alcoholic beverages, and the answer to said question 'none' was false; and the defendant further says that the ·said Alexander for a long time prior to and after the making of said representations habitually used alcoholic beverages and that he was often under the influence of alcoholic beverages and drinks and was often intoxicated before and after the making of said representations, and that his answer to the question, 'Have you ever used them to intoxication?' was false and untrue."

The appellee contends that: "There being no proof that the policy sued on contained an incontestable clause, merely pleading such is not sufficient and appellant having pleaded no notice to the insured or to the beneficiary of its refusal to be bound on the policy by reason of the alleged misrepresentations of insured in his application, in compliance with article 5044, was barred as a matter of law from defending an action brought on the policy on the grounds of misrepresentations and that the Court committed no error in sustaining the exception on said ground."

In one of the paragraphs of appellant's answer it was pleaded that the insurance policy contained a clause that the policy was incontestable after two years except for nonpayment of premiums, and that the deceased had killed himself within the first year after said policy was issued and within the contestable period, and appellant was therefore not liable except for the first year's premium.

■ The trial court having sustained an exception to the appellant's pleading wherein it alleged that the insured represented that he did not indulge in the drinking of intoxicating liquor, and the appellant having reserved a proper exception to the court's action, its failure thereafter to offer evidence in support of such stricken allegation can in no wise affect its right to have us pass upon such ac-

tion of the trial court in sustaining such exception.

■ The appellant contends that the insurance company is not required, under the law, to give notice that it will not be bound by the policy in order to avail itself of the defense of misrepresentation in the application, and that the court erred in sustaining such exception noted above.

So far as this court is concerned, this question has been settled adversely to appellee in the case of Gorman v. Jefferson Standard Life Insurance Co., 275 S. W. 248, 250. In that case the various articles of the statute which appellee insists requires the giving of ninety days' notice have been thoroughly considered, and the opinion of Judge Jackson says:

"Appellant * * * challenges the correctness of the action of the trial court in rendering judgment against her, and asserts that a misrepresentation in an application for life insurance to be material to the risk assumed must be one which actually contributes to the contingency upon which the policy becomes due and payable.

"Appellee replies thereto with a counter proposition that the policy contained a clause declaring it to be incontestable after 1 year from the date of the issue, and articles 4947 to 4951, V. S. C. S. [now article 5043 et seq., 1925], have no application.

"In 1903 the Legislature enacted articles 4947 to 4951 of V. S. C. S., and article 4947 provides in substance that any provision in a policy of insurance contracted for in this state which provides that the answers or statements made in the application for such insurance if untrue or false, shall render the policy void or voidable, shall be of no effect, and constitute no defense to a suit brought upon such insurance policy—

" 'Unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case.'

"Article 4951, referring to the articles preceding, one of which is article 4947, among other things, provides:

" 'The provisions of the foregoing articles shall not apply to policies of life insurance in which there is a clause making such policy indisputable after two years or less, provided premiums are duly paid.'

"The policy issued by appellee in the instant case provides that after one year it shall be incontestable for any cause, except nonpayment of premium, and the deceased died within the year, consequently, if these articles control, appellee's defense, based on fraud and misrepresentations, would not be affected or limited by the provisions thereof. * * *

"In 1909 the Legislature enacted article 4741 [now article 4732, 1925 statutes] which provides that no policy of life insurance shall be issued or delivered in this state unless it shall contain:

" 'A provision that the policy, or policy and application, shall constitute the entire contract between the parties and shall be incontestable not later than two years from its date, except for nonpayment of premiums.'

"After this article became effective, it was no longer left to the option or election of the insurance companies whether or not they would insert the incontestable clause in their life insurance policies, but was made mandatory. * * *

"We conclude, therefore, that the correct ruling is made in the case of Guarantee Life Insurance Co. v. Evert [Tex. Civ. App.], supra [178 S. W. 643], and that the articles of the statute 4947 to 4951 are not applicable to policies issued after December 31, 1909, but the law as found in the act of 1909 is controlling."

If the act of 1909, which is carried forward into subdivision 3 of article 4732, is controlling, as decided in the Evert and Gorman Cases, then there is no requirement that the insurance company shall give notice that it will not abide the contract of insurance, and the trial court erred in sustaining the plaintiff's exception to the defendant's answer because of its failure to specifically plead that it had given such notice.

■ There are, however, other grounds upon which defendant's answer is lacking in presenting a legal defense. It is not alleged that the misrepresentations were intentionally made by the insured for the purpose of misleading the defendant and in inducing it to issue the policy sued on. Neither is it alleged that the insured intentionally killed himself. Under the allegations in the defendant's answer, it might be true that the deceased killed himself, yet he may have done so accidentally and there can be no indulgence, in the face of a special exception, of the doctrine of reasonable intendment. That doctrine is only applied as against a general demurrer.

If misrepresentations were not intentionally made for the purpose of deceiving the defendant and causing it to act in issuing the policy, such misrepresentations offer no legal defense upon the ground of fraud.

Not only must it be alleged that the representations were false, but also that they were intentionally made for the very purpose of deceiving the defendant. Gorman Case, supra. False statements, to avoid insurance policies, must have been intentional and with design to deceive or defraud. Westchester

Fire Ins. Co. v. Wagner, 24 Tex. Civ. App. 140, 57 S. W. 876, writ denied.

As the defense of false representations made in the application is not charged to have been intentional, and as the defendant failed to allege that the insured's death was brought about by an act of his intending to take his own life, these defenses cannot defeat a recovery.

The appellant attacks as excessive the attorneys fees awarded the appellee in this case.

Article 4736, Revised Civil Statutes of Texas 1925, authorizes the recovery of attorneys fees in these insurance cases. Article 1862 of the same statutes prescribing the powers and jurisdiction of the Court of Civil Appeals requiring a remittitur, reads as follows: "In civil cases appealed to a Court of Civil Appeals, if such court is of the opinion that the verdict and judgment of the trial court is excessive and that said cause should be reversed for that reason only, then said appellate court shall indicate to such party, or his attorney, within what time he may file a remittitur of such excess. If such remittitur is so filed, then the court shall reform and affirm such judgment in accordance therewith; if not filed as indicated, then to be reversed."

The various Courts of Civil Appeals who have decided questions arising under this last article have limited their authority to require a remittitur where they are of the opinion that the fee is excessive. Great Southern Life Insurance Co. v. Johnson, 13 S.W.(2d) 424. This rule was also applied by Judge Pleasants of the Galveston Court in the case of Southland Life Insurance Co. v. Norton, 9 S.W.(2d) 752. However, the Commission of Appeals, with the express approval of the Supreme Court in this last-named case wherein the Supreme Court had granted a writ of error, 5 S.W.(2d) 767, 768, has held that the power and jurisdiction of the Court of Civil Appeals under the last above quoted article holds otherwise. That court says:

"The above statute provides for a reasonable attorney fee for the prosecution and collection of such loss. This means such a fee as would be reasonable for a litigant himself to pay his own attorney for prosecuting the case, and not a speculative or contingent fee based upon the uncertainty of the litigation. As applied to the case at bar, it is the purpose and object of the statute to allow the plaintiff a reasonable sum for a competent attorney, or firm of attorneys, to represent him in the case and prosecute the litigation, and the statute does not contemplate a fee for more than one attorney or firm of attorneys. * * *

"The Court of Civil Appeals, in passing on the question as to whether the verdict and judgment are excessive as to attorney fees, as above stated, holds in effect that they are bound by the direct testimony in the record bearing on this issue. We do not agree with this holding. Under article 1862, above quoted, the Court of Civil Appeals has the right to look to the entire record in the case before them, and to view the matter in the light of the testimony, the record before them, the amount in controversy, and their own common knowledge and experience as lawyers and judges."

The Galveston Court interprets this holding to mean that the Court of Civil Appeals has the power and jurisdiction to set aside the verdict of the jury and to render such judgment in favor of the plaintiff for such attorney's fees as seems to them fair and reasonable in the light of all the other testimony in the record and from their own common knowledge and experience as lawyers and judges and render judgment accordingly.

The plaintiff has alleged in her petition that she is entitled to a reasonable attorney's fee. Under the evidence in the case and all the evidence in the case, it appears that a reasonable attorney's fee in this case is $750, for which the trial court rendered judgment. This testimony and this finding, according to our understanding, is a matter within our discretion to pass on as reasonable for the services rendered.

In the Johnson Case, supra, this court held that a judgment for $750 was not warranted in that particular case, because the evidence in that case showed that a reasonable fee was from $450 to $500, and required a remittitur of $250 from the judgment therein recovered.

In this case the evidence justifies a judgment for $750 under the testimony in the case and under the finding of the jury. This we are loth to disturb, but under our view of the Norton Case as held by the Commission of Appeals, with the approval of the Supreme Court, it devolves on us to render such judgment as the entire record in the case before us, in the light of the testimony, the amount in controversy and our own knowledge and experience as lawyers and judges, to ascertain a reasonable fee for the services herein performed.

We have carefully considered the record and find that the fee allowed is very little in excess of the amount of the fee allowed in the Norton Case, supra, by the Commission of Appeals.

In this case, therefore, from all of such record and from our own common knowledge and experience as judges and lawyers, we have arrived at the conclusion from the services rendered in this case that the fee of $750 is not excessive and here render judgment for the plaintiff in aid of the jury's verdict for the sum of $750 attorney's fees.

We therefore affirm the judgment of the trial court.