736 S.W.2d 874 (1987)
TEXAS GENERAL INDEMNITY COMPANY, Appellant,
v.
Jerry L. SPEAKMAN and Donald E. Coffman, Appellees.
No. 05-86-00334-CV.
Court of Appeals of Texas, Dallas.
August 13, 1987.
*875 Donald D. Wren, Dallas, for appellant.
William F. Billings, Dallas, for appellees.
Before STEPHENS, HECHT and BAKER, JJ.
STEPHENS, Justice.
Texas General Indemnity Company (TGI) appeals from the trial court's judgment awarding $134,950 to Jerry L. Speakman (Speakman) and Donald E. Coffman (Coffman) in payment of an insurance claim resulting from the total destruction by fire of a house and its contents owned by Speakman and Coffman. The trial court also awarded Speakman and Coffman $44,983.33 as reasonable attorney's fees, and $18,892.99 as prejudgment interest. The case was tried before the court. The sole issue at trial was whether the fire occurred *876 either as a result of arson or as a result of a hazard "increased by any means within the knowledge and control of the insured, provided such increase in hazard is not usual and incidental to the occupancy ...," thereby excusing TGI from paying under the insurance policy. At the conclusion of the trial, the court rendered judgment for the defendant, TGI, and ordered that plaintiffs, Speakman and Coffman, take nothing. Speakman and Coffman timely filed a "motion to correct judgment or for new trial" and a "first amended motion to correct judgment or for new trial." The trial court granted the motion filed by Speakman and Coffman, vacated and set aside its earlier judgment in favor of TGI, and rendered judgment in favor of plaintiffs Speakman and Coffman for their insurance claim, attorney's fees, and prejudgment interest, for a sum totaling $198,826.32. TGI filed a "motion to correct judgment or for new trial" and this motion was overruled by the trial court. TGI then perfected this appeal.
TGI asserts fifteen points of error on appeal. TGI's first seven points of error are argued together in TGI's brief, and challenge the legal and factual sufficiency of the evidence in support of the trial court's judgment. TGI groups its eighth through eleventh points of error together because each of these points of error contest the trial court's award of attorney's fees. TGI's twelfth through fifteenth points of error attack the trial court's award of prejudgment interest.
We disagree with TGI's first eleven points of error. We hold that the evidence is both legally and factually sufficient to support the trial court's implied finding of no arson. We also hold that the evidence is both legally and factually sufficient to support the trial court's award of $44,983.33 in attorney's fees. The appellees concede that the prejudgment interest was erroneously calculated. Consequently, appellant's twelfth through fifteenth points of error are sustained. The judgment of the trial court is reformed to the extent that a remittitur of prejudgment interest in the amount of $5,294.47 is ordered. If appellees timely file the above remittitur, the judgment of affirmance will be reformed to that extent. If appellees fail to file the remittitur, the judgment of affirmance will be set aside and the judgment of the trial court reversed and the cause remanded.

I. SUFFICIENCY OF THE EVIDENCE REGARDING ARSON
TGI argues in its first seven points of error that the evidence is legally and factually insufficient to support the judgment of the trial court.
The record reflects that Speakman and Coffman jointly owned a house in Tool, Texas, which was destroyed by fire on December 31, 1983. Three months before the fire Speakman and Coffman ceased living in the house on a full-time basis and instead spent a majority of their time at a townhome in Dallas which they had purchased together. Speakman and Coffman, after spending three or four consecutive weeks in Dallas, drove from Dallas to Tool on the morning of December 31, 1983. They visited Coffman's mother, who lived across the street from their home in Tool, and they visited some neighbors, Nan and David Merchant, before returning to their home in Tool at approximately 4:30 or 5:00 p.m. While visiting the Merchants, Speakman and Coffman decided to spend the night in Tool. The Merchants then gave Coffman and Speakman two five-gallon jugs of water because the water pipes were frozen and none of the homes in the area had water. Speakman borrowed the Merchants' van and left at approximately 5:30 or 5:45 p.m. to drive to Dallas and pick up the dog he and Coffman owned who was locked in their Dallas townhouse. At approximately 6:30 p.m. Coffman went across the street to his mother's house. Coffman took his mother out to eat dinner at K-Bob's Steakhouse and took her to buy groceries. Coffman and his mother arrived back at his mother's house at approximately 9:15 or 9:30 p.m. Coffman helped his *877 mother unload the groceries and then walked across the street to his house at approximately 9:30 p.m. Coffman testified that he intended to go home and get one of the five-gallon jugs of water the Merchants had given to him and Speakman and take it to his mother since he and Speakman would not use two five-gallon jugs of water in one night. Coffman testified that he opened his front door and "smoke just boiled out of the entry hall of the house." Coffman did not recall whether the front door was locked, but testified that his normal procedure was to keep the door locked while he was out. Coffman then returned to his mother's house across the street, and the fire department was called. Coffman testified that the smoke in the entry hall was thick and black and that, therefore, he was unable to enter the house to discover what was on fire or attempt to extinguish the fire. The fire department arrived approximately ten to twelve minutes later, and Coffman met them in the street. The firemen put on their masks and equipment and entered the house. The firemen worked for approximately thirty or forty minutes to put out the fire. The firemen then showed Coffman where the fire originated, in the back bedroom on a bed. The actual fire damage was confined to the back bedroom although there was smoke damage throughout the house. The firemen had opened all of the house's 32 windows and had chopped up a portion of the bedroom floor to ascertain whether the fire had spread below the floor. Coffman testified that one of the firemen told him to check the house every hour for the remainder of the night.
Coffman testified that he left his house at the same time the firemen departed, and walked across the street to his mother's house to await Speakman's return. Approximately twenty minutes later Coffman saw Speakman drive up. Coffman "intercepted" Speakman before he entered their house and Coffman, Speakman, and the dog returned to Coffman's mother's house. As Coffman and his mother explained the events of the evening to Speakman, Coffman's mother noticed that the house was on fire again. Coffman testified that he looked out his mother's front door and "flames were shooting out of the top of the house." Coffman told his mother to call the fire department while he and Speakman ran across the street to attempt to remove articles from the house. However, Coffman and Speakman were unable to save any of their home's furnishings from the second fire. The fire department arrived at approximately 11:15 p.m. and finally extinguished the second fire. The house and its contents, with the exception of one painting, were destroyed. Coffman testified that the painting hung in the entry hall, and that after the firemen arrived for the first time, he reached inside the front door and retrieved the painting.
Coffman testified that he and Speakman did not keep anything unusually dangerous or inflammatory in their home. Coffman said that he and Speakman had lit four or five scented candles when they first arrived at their home in Tool, to remove the dank smell a "tied up" house acquires. According to Coffman, the house contained a wet bar which was well stocked with approximately seven or eight gallons of liquor. There were two shotguns and some shotgun shells in the house. There was an empty gas can used to store gas for the lawnmower and a can of "deck sealant" used to treat their wood deck in the garage. The garage was used as a storage room and the garage was so full that a car would be unable to fit into the garage unless the garage was first cleaned out.
On the date of the fire, Coffman and Speakman's house was insured for $84,500, and Coffman and Speakman had $50,700 of unscheduled personal property insurance coverage. Coffman testified that, in his opinion, the house was worth $90,000 in excess of the insurance policy coverage. Coffman testified that the value of their personal property contained in the house exceeded $57,700, the amount of personal property insurance coverage.
At the time of the fire, the house in Tool was not carrying a mortgage and the town *878 house in Dallas had a $30,000 mortgage. Coffman and Speakman put the house in Tool up for sale on two occasions prior to the fire; once several years before the fire and once seven or eight months before the fire. The house in Tool was not for sale at the time of the fire, and Coffman testified that he and Speakman were planning to keep the house and possibly add a hot tub and greenhouse.
Bill Forester testified that he has been employed with the Dallas Fire Department for twenty-seven years. Forester was chief of the Tool Volunteer Fire Department at the time of the fire in question. Forester related that he helped fight both the first and second fires. Forester testified that after the first fire was extinguished, he sent someone into the attic to be certain the fire had not spread upward into the attic. Forester was unable to remember who checked the attic. Forester was unable to determine how the first fire originated. Forester testified that he was surprised when he was called a second time and asked to return to the scene because the house was on fire again. Flames were shooting out of the roof and many of the open windows when the fire department arrived for the second time. Forester, during the course of the second fire, went to the rear of the house. The garage door was down and locked. After some panels in the garage door were knocked out, Forester observed a "pretty blue flame" burning on the garage floor. Forester testified that unless water was continuously sprayed on the floor, the flame would immediately reignite. Forester testified that, based on the amount of the house involved in the second fire and the short time lapse between the first and second fire, in his opinion the second fire was incendiary. Forester testified on cross-examination that a blue flame could be caused by petrochemicals such as those contained in gasoline, alcohol, paint thinner, and lacquer thinner. Forester admitted on cross, that the second fire could possibly have been a rekindle stemming from the first fire. Forester testified in response to questions by the trial court that the garage was not filled with smoke in an amount disproportionate to the flame involved as is common with petrochemically induced flames.
Travis Roberts, Fire Marshall for the City of Athens, testified that Forester called him to assist in an investigation regarding the fire at Coffman and Speakman's house in Tool. Roberts testified that he had been in the fire fighting business for seventeen years and that he had considerable training and experience in arson investigations. Roberts testified that he went to the scene of the fire the morning after the fire. He took three samples from three different areas in the house that appeared to have strange "burn patterns", indicating an accelerant may have been used to cause the fire to burn more rapidly. Roberts sent the samples to the Department of Public Safety (DPS) lab in Austin for analysis. Although there was a delay because the box containing the samples was damaged en route to Austin, the lab ultimately reported that no traces of any flammable liquid had been found. Roberts testified that while he was at the scene he observed two burned out cans in the garage. The cans could have contained gasoline or a flammable liquid and appeared to be situated where they were stored. Roberts testified that liquor like that stored in the wet bar could possibly act as an accelerant. Roberts testified regarding "burn patterns" and "trailers" and the fact that the burn patterns and trailers at the scene of the fire in question suggested the presence of an accelerant. Roberts testified that "rekindles" sometimes occur despite the best efforts of firefighters.
Donald Owen testified that he was a member of the Tool Volunteer Fire Department and that he helped fight both fires in question. Owen testified that he never observed anyone check the attic after the first fire. Owen testified that he was the firefighter who chopped out the panels in the garage door during the second fire and that he did not notice a blue flame on the garage floor. Owen testified that if there *879 had been blue flame he would have noticed. Owen also testified that he wasn't particularly looking for types of flames but was instead concentrating on fire fighting and that if, in fact, Forester was near the garage and observed a blue flame, he, Owen, would have no reason to doubt Forester. Owen testified that it was his experience that rekindles sometimes do occur.
Kal Britt McManus testified that he was the president of Loss Research and Analysis Inc. (LRA) and that LRA was employed by Texas General Indemnity Insurance Company to "determine the origin cause of the fire damage that occurred at the insured's loss." McManus testified that he went to the fire site to conduct his field test approximately three weeks after the fire occurred. McManus testified that he "did an overall exterior survey of the loss to determine the amount of structural damage that resulted from the fire, measured and charted the fire scene, conducted an interior inspection of the loss, photographed the fire scene, removed debris, and obtained a sample of residual debris." McManus testified regarding the thirty-two photographs he took at the fire scene, and the areas of the house shown in each photo. McManus explained the differences between a natural fire and an incendiary fire. McManus testified that he sent samples from the fire scene to Dr. Armstrong, a chemist. Armstrong's report to McManus indicated that the sample contained a residue of a gasoline mixture. McManus testified that in his opinion both of the fires were intentionally set. McManus testified that he based this opinion on the facts that "number one, the burn patterns are associated with that achieved when a flammable liquid is applied and ignited on a flooring surface, number two, the chemical analysis report, and, number three, the time factors involved from when the fire department first left the scene of the house after the first fire and when it was noted fully involved when the second fire occurred." McManus testified regarding "rekindle" fires and alcohol as a flammable liquid.
On cross-examination McManus testified that he did not know about the well-stocked wet bar at the time he made his investigation and subsequent diagrams. McManus stated that such knowledge would not change his opinion concerning the nature of the fire. McManus testified that at the time he made his investigation, he did not know of the candles Coffman and Speakman left burning in their house prior to the fire. McManus testified that neither the location nor the size of any burning candles would have an impact on his opinion. McManus testified that "spalling marks" are very common when an accelerant is used on concrete and that, in the case at bar, no spalling marks were found on the concrete garage floor of Coffman and Speakman's house. McManus testified that he did not note in his report the wind conditions on the date of the fire, and that a stiff wind would indeed increase the speed of the fire. McManus testified that he knew all of the house's thirty-two windows had been left open after the first fire. McManus testified that he did not investigate who set the fires.
Coffman's mother testified, basically corroborating the facts related by Coffman. She also testified that at no time during the night in question did she smell gasoline on either Coffman or Speakman. She testified that both Coffman and Speakman were continuously with her between the first fire and the second fire. She testified that during the second fire she attempted to call neighbors and warn them of the fire due to the high winds and blowing dry leaves.
Jerry Speakman testified basically to the same facts related by Coffman and Coffman's mother. Speakman testified as to his and Coffman's financial status at the time of the fire. He testified that the house in Tool was totally paid off and that the payments on the townhome in Dallas were approximately $370 or $375 a month. Speakman testified that at the time of the fire he was making just under $60,000 a year and Coffman was making over $20,000 a year. Speakman testified that Nan Merchant and Coffman's mother both had keys to his house in Tool for maintenance *880 purposes. Speakman testified that there were high winds on the night of the fire.
In the case at bar, trial was to the judge without intervention of a jury. The court entered judgment on October 24, 1985, that the plaintiffs, Coffman and Speakman, take nothing. On October 29, 1985, plaintiffs filed a request for findings of fact and conclusions of law. However, the court never filed its findings of fact and conclusions of law. Plaintiffs did not, as required by Rules 296 and 297 of the Texas Rules of Civil Procedure, make a second request for findings of fact and conclusions of law. Plaintiffs instead filed a "Motion to Correct Judgment or for New Trial." The court, on December 11, 1985, conducted a hearing on plaintiff's motion. Then, on December 26, 1985, the court granted plaintiffs' motion to correct judgment, vacated and set aside the October 24, 1985 judgment in favor of TGI, and entered judgment for plaintiffs for a total sum of $198,826.32. Neither plaintiffs nor defendant requested findings of fact or conclusions of law following the entry of the court's December 26, 1985, judgment.
TGI's first seven points of error are argued together in its appellant's brief. Points of error one through six attack both the legal and factual sufficiency of the evidence to support the trial court's judgment. Point of error number seven contends that the trial court erred in overruling TGI's "motion to correct the judgment or motion for new trial" because TGI alleged in its motion that the fire in question was intentionally set. When no findings of fact and conclusions of law are filed, the trial court judgment implies all necessary fact findings in support of its judgment. Carter v. William Sommerville & Son, Inc., 584 S.W.2d 274, 276 (Tex.1979); Buchanan v. Byrd, 519 S.W.2d 841, 842 (Tex. 1975); Douglas v. West Alabama, Ltd., 722 S.W.2d 736, 737 (Tex.App.Houston [14th Dist.] 1986, no writ). These implied findings may be challenged by "insufficient evidence" and "no evidence" points the same as jury findings and a trial court's findings of fact. Burnett v. Motyka, 610 S.W.2d 735, 736 (Tex.1980). In reviewing the record on a "no evidence" point to determine whether there is legally sufficient evidence to support the judgment and its implied findings, it is proper to consider only the evidence favorable to the judgment and disregard all evidence or inferences to the contrary. See Carter v. William Sommerville & Son, Inc., 584 S.W.2d at 276; Goodyear Tire & Rubber Co. v. Jefferson Construction, 565 S.W.2d 916, 918 (Tex.1978). In deciding an "insufficient evidence" point when dealing with implied findings in support of the judgment, we must apply the normal "insufficient evidence" standard and consider and weigh all the evidence, including any evidence contrary to the trial court's judgment to determine whether the evidence is factually sufficient to support the trial court's judgment. See Burnett, 610 S.W.2d at 736.
Specifically, TGI's first seven points of error challenge the legal and factual sufficiency of the evidence to support the trial court's implied finding that there was no arson. TGI had the burden, at trial, of proving arson by a preponderance of the evidence. See Bufkin v. Texas Farm Bureau Mutual Insurance Company, 658 S.W.2d 317, 320 (Tex.App.Tyler 1983, no writ); State Farm Mutual Automobile Insurance Company v. Davis, 576 S.W.2d 920, 921 (Tex.Civ.App.Amarillo 1979, writ ref'd n.r.e.). It has long been the law in this state that arson may be established by circumstantial evidence. Garrett v. Standard Fire Insurance Company of Hartford Connecticut, 541 S.W.2d 635, 638 (Tex.Civ.App.Beaumont 1976, writ ref'd n.r.e.). Under the criminal law, "A person commits an offense [of arson] if he starts a fire with intent to destroy or damage any building: knowing that it is insured against damage or destruction." Texas Penal Code Ann. § 28.02(a)(2) (Vernon Supp.1987) (emphasis added). Hence, as TGI admits in its brief, it was incumbent on TGI at trial to prove by direct or circumstantial evidence *881 that, by a preponderance of the evidence, either or both of the fires in question were incendiary in nature and that they were set by the insureds, Speakman or Coffman.

(1) Legal Sufficiency
We will first address the "no evidence" challenges to the trial court's implied finding of no arson. We have extensively reviewed the record, and we hold that there is more than a mere scintilla of evidence to support the trial court's implied finding of no arson. The trial court could have decided that there was no arson either because the fire was not incendiary or because the insured did not start the fire, or cause the fire to be started. The evidence adduced at trial, and the reasonable inferences therefrom, which are favorable to the trial court's judgment show: (1) that the appellees denied starting the fires; (2) that the second fire was a rekindle because Don Owen, a firefighter at the scene, did not observe a blue flame in the garage and testified that he believed that the second fire was a rekindle; (3) that Coffman and Speakman had no motive to burn their house because the house and its contents were under-insured; (4) that Coffman and Speakman did not have the opportunity to set the second fire because they were with Coffman's mother the entire time between the first and second fire; (5) that the second fire was a rekindle since there were no spalling marks on the house's concrete garage floor; (6) that the fire was not incendiary in nature because samples taken by Travis Roberts and mailed to the DPS in Austin failed to show any traces of an accelerant; (7) that the second fire was not incendiary in nature because the stiff winds and the fact that the house windows were open could have contributed to the rapid spread of the second fire; (8) that the second fire was a rekindle because Don Owen testified that he did not observe anyone check the attic nor hear Bill Forester ask anyone to check the attic; (9) that Coffman and Speakman did not have any motive for setting the fires because they were not experiencing financial difficulty at the time of the fire; (10) that the second fire was not incendiary because the liquor in the wet bar could have contributed to the rapid spreading of the second fire; (11) that the fires were not incendiary because Coffman and Speakman lacked motive because they were not attempting to sell the house at the time of the fire, and the house was not carrying a mortgage; (12) that the second fire was not incendiary in nature because the rapid spread of the flames in the garage could have been due to the various paints, floor sealants, and lacquers stored there; and (13) that the second fire was not caused by accelerants because the amount of smoke present during the fire was not disproportionate to the quantity of flames. In light of the foregoing, we hold that there is some evidence to support the trial court's implied finding of no arson.

(2) Factual Sufficiency
We will now address TGI's factual sufficiency points. TGI introduced evidence controverting portions of the evidence recited above. However, we are unable to say that, viewing the record as a whole, the trial court's implied finding of no arson was against the great weight and preponderance of the evidence.
TGI argues that it circumstantially proved both elements of arson: (1) that the fire was incendiary in nature; and (2) that the insured appellees set the fires in question, and that, therefore, the trial court's implied finding of no arson is against the great weight and preponderance of the evidence. TGI asserts that "where there is proof of the incendiary nature of the fire, placement of the insured or accused in close proximity to the time and place of the origin of the fire is sufficient to establish arson by circumstantial evidence." TGI cites numerous cases in support of this contention.
We agree with TGI that arson may be established by circumstantial evidence. See Garrett v. Standard Fire Insurance Company of Hartford Connecticut, 541 *882 S.W.2d 635, 638 (Tex.Civ.App.Beaumont 1976, writ ref'd n.r.e.). However, the cases relied on by TGI are distinguishable from the case at bar. In each of the cases cited by TGI, the fact finder made an affirmative finding that the fire was caused by arson. On appeal, the appellate courts in the cases relied upon by TGI, held that there was enough circumstantial evidence to support the finding of arson. In the case at bar, the trial court made an implied finding of no arson. This is not a case, like the cases relied on by TGI, in which there has been a finding of arson by the fact finder. In the present case, viewing the record as a whole, the circumstantial evidence of arson presented by TGI is not so overwhelming that the trial court's finding of no arson is against the great weight and preponderance of the evidence. Therefore, TGI's first seven points of error are overruled.

II. ATTORNEY'S FEES
TGI, in its eighth through tenth points of error, respectively, asserts that the trial court erred in awarding a one-third contingency fee of $44,893.33 in attorney's fees to appellees because: the evidence is legally insufficient to support the award; the evidence is factually insufficient to support the award; and the award is excessive. In its eleventh point of error, TGI claims that the trial court erred in overruling its motion to correct judgment or for a new trial because TGI complained of the attorney's fees award in its motion.
TGI concedes in its brief that Texas Revised Civil Statutes Annotated, Article 2226 "permits the [p]laintiffs, as prevailing parties on this breach of contract action, to recover reasonable attorney's fees." Therefore, whether or not Coffman and Speakman can recover attorney's fees is not the issue. The dispute centers upon the dollar amount appellees may recover as attorney's fees. The 1979 version of Article 2226 was in effect at the time this suit was filed and, hence, is applicable in this appeal. The relevant version of Article 2226 provides in pertinent part:
[C]laimant may, if represented by an attorney, also recover, in addition his claim and costs, a reasonable amount as attorney's fees. The usual and customary fees in such cases shall be presumed to be reasonable, but such presumption may be rebutted by competent evidence.
See Acts 1979, 66th Leg., p. 718 ch. 314, § 1 repealed; see now § 38.001 TEX.CIV. PRAC. & REM.CODE ANN. (Vernon 1986).
The trial court based its award of $44,893.33 in attorney's fees, an amount equal to approximately one-third of the plaintiffs' total recovery, on the following testimony:

DIRECT EXAMINATION
BY MR. BILLINGS [plaintiffs'/appellees' attorney]
MR. BILLINGS: My name is William M. Billings and I have been licensed to practice in the State of Texas since 1948, currently engaged in practice and have been continuously in practice since about 1955 in Dallas County, Texas. I am familiar with fees charged in this County. On or about June 27, 1984, Mr. J. Gordon Shanklin and I were employed by Jerry Speakman and Donald Coffman to represent them in connection with their claim under an insurance policy against Texas General Indemnity Company, a corporation authorized to do business in Texas, and I believe, incorporated in the State of Colorado.
Pursuant to that agreement, we entered into a written contract of employment, dated June 27, 1984, which is in evidence as Plaintiff's Exhibit 6, in which they, the Plaintiffs herein, agreed to pay us a one-third contingent fee and to be liable in addition for any reasonable expenses incurred in the representation and preparing the case for trial: deposition expenses, witness fees, and court costs. Pursuant to that agreement, we have talked to witnesses, we have examined and reviewed various documents, and we have prepared pleadings, bringing the *883 lawsuit against the insurance company. We have taken depositions, we have employed and directed the services of an investigator. We have conferred with him on a number of occasions. We have conferred with our clients on a number of occasions, talked to witnesses, we have conducted legal research on certain points involved in this litigation. We have appeared in Court as the Court records will reflect from time to time, we prepared for trial on at least two occasions and have conducted the trial of this cause which began on Monday, a non-jury trial. Essentially, that is the work that we have performed and it is my opinion that a one-third contingent fee arranged is a customary contingent fee arrangement in this county for attorneys and that it is a reasonable fee under the facts of this case.
MR. SHORE: I have just a couple of questions.

CROSS-EXAMINATION
BY MR. SHORE:
Q. Mr. Billings, do you have a record of the time spent working on the file by you and Mr. Shanklin or your associates?
A. Since it's a contingent fee arrangement, I have not kept detailed time records.
Q. Is there an approximation that you have with respect to the number of hours?
A. I would estimate that my own time has been somewhere close to 60 hours.
Q. Do you have any estimation as to Mr. Shanklin's time?
A. I don't know how much time Mr. Shanklin has spent on the case, but probably more than I have by the factor of two, I would say.
Q. With respect to the depositions that have been taken in the case, there have been three depositions, Mr. McManus, Mr. Coffman and Mr. Roberts, correct? And the statements were all taken early on in the case.
A. That's right. They each gave us one statement to the insurance company representative, which I believe you took prior to the institution of the lawsuit.
Q. And the pleadings have been filed in the case by the Plaintiffs, have been the original petition and one set of interrogatories, correct?
A. I believe that is correct, whatever the file discloses.
MR. SHORE: That is all I have.
THE COURT: You may step down.
John Hunter Winborn testified that he was an attorney actively engaged in the practice of law in Dallas County. Winborn stated that he handled family law and did a fair amount of civil litigation. Winborn testified that he was familiar with usual attorney's fees in Dallas County and that based on his review of the appellees' attorney's file, a one-third contingency fee was usual, reasonable, and customary in Dallas County. Winborn testified on cross-examination that he had handled two criminal arson cases but that he had never handled a civil arson case.
Richard Shore, attorney for TGI, testified as follows:

DIRECT EXAMINATION
BY MR. SHORE:
My name is Richard A. Shore. I am a licensed practicing attorney in the State of Texas, County of Dallas, with the law firm of Stradley, Smith, Stephens & Wright. I am experienced in insurance defense litigation, as well as the Plaintiff's litigation, and have handled between five and six of these type of fire cases over the last few years. I am not aware as far as in Dallas County of a one-third contingency fee contract utilized in a case like this and in my opinion, based on the facts of this case and the purported complexity of the case, that an hourly fee arrangement would have been more of a reasonable relationship between the cause of action and the recovery.
*884 Having reviewed the file prior to the time of trial, I have approximately fifty-one hours in the case which fairly coincide with the stated testimony of Mr. Billings. This case has not been worked up extensively from a discovery standpoint with respect to an original petition and answer, and interrogatories filed. There have been three depositions taken, one of the fire marshall Roberts and one of Ora Coffman, we well as one of Britt McManus, and a short deposition taken of Don Coffman.
None of those depositions in and of themselves lasted more than three hours or through four hours, and based on the work in the case and the complexity of the case, it is my opinion that the attorney's fee contract of one-third contingency based on the amount pled for, $145,500, does not have a reasonable relationship.
That's all.
MR. BILLINGS: I have no questions for him, but I would testify thusly that my recollection is that I estimated that I had approximately fifty hours in the case and Mr. Shanklin had twice that many and we also had an associate, Mr. Randy Willis, who has spent about fifteen hours, so our total hours would more likely approximate a hundred and fifty or thereabouts, possibly in excess or possibly a little below, that we have done on an hourly basis.
MR. SHORE: The only thing with respect to that, Your Honor, would be to ask Mr. Billings how much of that is duplicitous with respect to more than one attorney working on the file at one time.
MR. BILLINGS: Well, I would say possibly ten to fifteen hours of it would be where both of us attended the depositions, for instance.
MR. SHORE: That's all I have.
We must determine whether the above recited testimony constitutes legally and factually sufficient evidence to support the trial court's award of attorney's fees, and whether the award is excessive. Since no findings of fact or conclusions of law have been filed, the trial court judgment implies all necessary findings in support of its judgment. See Carter v. William Sommerville & Son, Inc., 584 S.W.2d at 276. The amount and reasonableness of attorney's fees is a question of fact. See Mack v. Moore, 669 S.W.2d 415, 420 (Tex.App. Houston [1st Dist.] 1984, no writ); Industrial Disposal Supply Company, Inc. v. Perryman Brothers Trash Service, Inc., 664 S.W.2d 756, 761 (Tex.App.San Antonio 1984, writ ref'd n.r.e.). Hence, we must infer that the trial court found that $44,983.33 was a reasonable amount of attorney's fees in the present case. See Murray v. Templeton, 576 S.W.2d 138, 140 (Tex.Civ.App.Texarkana 1978, no writ). We will now review the factual and legal sufficiency of the evidence to support the trial court's implied finding of reasonableness.

(1) Legal Sufficiency
Mr. Billings testified concerning the work he had performed on appellees' behalf; holding conferences, interviewing witnesses, conducting research, and preparing for trial. Mr. Billings also testified, "[I]t is my opinion that a one-third contingent fee arranged [sic] is a customary contingent fee arrangement in this county for attorneys and that it is a reasonable fee under the facts of this case" (emphasis added). Mr. Winborn also testified regarding the reasonableness of plaintiff's attorney's fees. Clearly this testimony constitutes more than a mere scintilla of evidence regarding the reasonableness of the attorney's fees awarded. Consequently, the evidence is legally sufficient to support the trial court's award of $44,983.33 in attorney's fees.
TGI argues that the testimony recited above constitutes "no evidence" because evidence of a contingent fee contract will not support an award of attorney's fees. In support of this contention TGI cites Mutual Life Insurance Company v. Daddy$ Money, Inc., 646 S.W.2d 255 (Tex. *885 App.Dallas 1982, writ ref'd n.r.e.); Group Life and Health Insurance Company v. Turner, 620 S.W.2d 670 (Tex.Civ. App.Dallas 1981, no writ); Prudential Insurance Company v. Uribe, 595 S.W.2d 554 (Tex.Civ.App.San Antonio 1979, writ ref'd n.r.e.); Community Life & Health Insurance Company v. McCall, 497 S.W.2d 358 (Tex.Civ.App.Amarillo 1973, writ ref'd n.r.e.). The above cases all involve an award of attorney's fees under Article 3.62 of the Texas Insurance Code.
TGI argues that the above cases involve are nonetheless applicable to the case at bar. TGI draws this conclusion because the following definition of "reasonable attorney's fees" has been adopted by Texas courts construing both Article 3.62 of the Texas Insurance Code and Article 2226 of the Texas Revised Civil Statutes Annotated.
[Reasonable attorney's fees are] such fees as a litigant would pay his own attorney for prosecuting the case and not a speculative or contingent fee based upon the uncertainty of litigation.
Southland Life Insurance Company v. Norton, 5 S.W.2d 767, 768 (Tex.Comm'n App.1928, holding approved). Texas courts construing the meaning of "reasonable attorney's fees" under Article 3.62 of the Texas Insurance Code have applied the Norton definition of reasonable attorney's fees. See e.g. Prudential Insurance Company v. Uribe, 595 S.W.2d 554, 570 (Tex. Civ.App.San Antonio 1979, writ ref'd n.r. e.); Republic National Life Insurance Company v. Heyward, 568 S.W.2d 879, 887 (Tex.Civ.App.Eastland 1978, writ ref'd n.r.e.); American Central Life Insurance Company v. Alexander, 39 S.W.2d 86, 90 (Tex.Civ.App.Amarillo 1931), affirmed, 56 S.W.2d 864 (Tex.Comm'n App.1933, judgmt adopted). Likewise, Texas Courts construing Article 2226's provision for recovery of "a reasonable amount as attorney's fees" have adopted the Norton definition of reasonable attorney's fees. See e.g., Cooper v. Wildman, 528 S.W.2d 80, 85 (Tex.Civ.App.Corpus Christi 1975, no writ); Flagg Realtors, Inc. v. Harvel, 509 S.W.2d 885, 893 (Tex.Civ.App.Amarillo 1974, writ ref'd n.r.e.); Wisznia v. Wilcox, 438 S.W.2d 874, 879 (Tex.Civ.App.Corpus Christi 1969, writ ref'd n.r.e.).
TGI argues that based on the Norton definition of reasonable attorney's fees such fees as a litigant would pay his own attorney for prosecuting the case and not a speculative or contingent fee based upon the uncertainty of litigationevidence of a contingent-fee contract arrangement will not support an award of attorney's fees under either Article 3.62 of the Texas Insurance Code or under Article 2226 of the Texas Revised Civil Statutes. TGI contends that testimony regarding a contingency fee arrangement is not evidence of "reasonable attorney's fees" under the Norton definition, and hence, is "no evidence" in support of the trial court's award of attorney's fees since by the terms of the Article 2226, attorney's fees must be reasonable.
We disagree with appellant's contention. The cases relied upon by TGI were either decided under Article 3.62 of the Texas Insurance Code, or were decided prior to the 1979 amendment to Article 2226 which provided that customary and usual attorney's fees are presumed to be reasonable. A contingent fee that is customary and usual is presumed to be reasonable if unrebutted. See Hocheim Prairie Farm Mutual Insurance Association v. Burnett, 698 S.W.2d 271, 278 (Tex.App.Fort Worth 1985, no writ); Texas Farmers Insurance Co. v. Hernandez, 649 S.W.2d 121, 124 (Tex.App.Amarillo 1983, writ ref'd n.r.e.); Wenk v. City National Bank, 613 S.W.2d 345, 352 (Tex.Civ.App.Tyler 1981, no writ). However, the presumption that usual and customary attorney's fees are reasonable if they are not controverted, is not a conclusive, mandatory presumption. See Bethel v. Butler Drilling Company, 635 S.W.2d 834, 841-42 (Tex.App.Houston [14th Dist.] 1982, writ ref'd n.r.e.).
In the case at bar, the presumption set forth in Article 2226that usual and customary *886 attorney's fees are presumed reasonablewas rebutted by Mr. Shore's testimony that an hourly rate was "more reasonable" because one-third contingent fee contracts were not, in Mr. Shore's experience, used in this type of case in Dallas County. Once the statutory presumption was rebutted, a fact issue arose as to the amount of attorney's fees constituting reasonable attorney's fees. See generally, Gifford v. Old Republic Ins. Co., 613 S.W.2d 43, 46 (Tex.Civ.App.Houston [14th Dist.] 1981, no writ). The trial court in the present case apparently believed the testimony of Mr. Billings that one-third of the total recovery "is a reasonable fee under the facts of this case." The evidence is legally sufficient to support the trial court's award of $44,893.33 in attorney's fees. TGI's eighth point of error is overruled.

(2) Factual Sufficiency
We have weighed all the evidence in the case at bar, and we hold that the evidence is factually sufficient to support the trial court's award of $44,893.33 in attorney's fees. Obviously, the trial court believed Mr. Billings' and Mr. Winborn's testimony that one-third of the total recovery was a reasonable fee. Mr. Shore's testimony that he was not familiar with any arson cases which had been handled on a contingency fee basis and that in his opinion an hourly rate would be a more reasonable fee, does not constitute such overwhelming evidence that the trial court's implied finding of reasonableness was against the great weight and preponderance of the evidence. TGI's ninth point of error is overruled.

(3) Excessiveness of the Award
A court of appeals, in determining whether an award of attorney's fees is excessive, has the authority to look to the entire record in the case before them, and view the matter in light of the testimony, the record before them, the amount in controversy, and their own common knowledge and experience as lawyers and judges. Norton, 5 S.W.2d at 769; Wenk, 613 S.W.2d at 392. We hold that, in light of the entire record, the complexity of the case, the hours expended by plaintiff's attorney on the case, and the fact that plaintiff's attorney took the case on a contingency fee arrangement, the trial court's award of $44,893.33 in attorney's fees is not excessive. TGI's tenth point of error is overruled.
Since we have held that the trial court did not err in awarding $44,893.33 in attorney's fees, clearly the trial court did not err in overruling TGI's motion for new trial which argues that said award was error. TGI's eleventh point of error is therefore overruled.

III. PRE-JUDGMENT INTEREST
In its twelfth through fifteenth points of error, TGI complains of the trial court's calculation of pre-judgment interest. TGI contends that the amount of pre-judgment interest owed by them, in the event they are unsuccessful in this appeal, is $13,598.52 rather than $18,892.99 as reflected in the judgment of the trial court. Appellees, in their brief, agree to a remittitur of $5,294.47 to correct the amount of pre-judgment interest. On the date of submission of this case, during oral argument, this Court asked TGI whether it agreed with appellees' computation of pre-judgment interest, and TGI responded in the affirmative. Therefore, since both parties have agreed that the correct amount of pre-judgment interest in this case is $13,598.52 and since appellees have agreed to a $5,294.47 remittitur, we will not address TGI's twelfth through fifteenth points of error. If appellee timely files a remittitur in the amount of $5,294.47, reducing the trial court's award of pre-judgment interest to $13,598.52, the judgment of affirmance will be reformed to that extent. If appellee fails to timely file said remittitur of pre-judgment interest, the judgment of affirmance will be set aside, and the judgment of the trial court reversed, and the cause remanded.
BAKER, J., files a concurring opinion. *887 BAKER, Justice, concurring.
While I am in agreement with the majority's disposition of the case affirming the trial court's judgment and awarding recovery on the policy of insurance itself, I find myself in disagreement with the majority's rationale disposing of the appellant's complaint on the award of attorneys' fees.
Appellant argued that testimony by appellees' attorney with regard to their contingent fee contract was "no evidence" because such evidence will not support an award of attorneys' fees. The appellant relied on four cases, two of which are opinions of this court. In Mutual Life Insurance Company v. Daddy$ Money Inc., 646 S.W.2d 255 (Tex.App.Dallas 1982, writ ref'd n.r.e.), and Group Life and Health Insurance Company v. Turner, 620 S.W.2d 670 (Tex.Civ.App.Dallas 1981, no writ), this Court held that evidence of a contingent fee contract will not support an award of attorneys' fees under TEX.INS. CODE.ANN. art. 3.62 (Vernon Supp.1980). This Court held that Article 3.62 authorizing the recovery of reasonable attorneys' fees contemplates the recovery of "such a fee as would be reasonable for a litigant himself to pay his own attorney for prosecuting the case, and not a speculative or contingent fee based upon the uncertainty of the litigation". Both Mutual Life and Group Life were cases involving the recovery of reasonable attorneys' fees under Article 3.62 as a result of a suit being based upon the failure of the insurance carrier to pay a claim under the insurance policy in effect. Appellant in this case argued that the rationale applied in Mutual Life and Group Life should apply to the recovery of attorneys' fees in this case; and that an award of attorneys' fees based upon a contingent fee agreement is no evidence of such fee, or alternatively an excessive fee. As pointed out by the majority, the Texas courts (including this Court) in construing the meaning of "reasonable attorneys' fees" under Article 3.62 have applied the definition of reasonable attorneys' fees as initially enunciated by the supreme court in Southland Life Insurance Company v. Norton, 5 S.W.2d 767, 768 (Tex. Comm'n App.1928, holding approved). In my opinion the same rationale should apply to the recovery of attorneys' fees in cases similar to the instant case. In Mutual Life and Group Life the plaintiff instituted suit to recover under a policy of insurance and in addition thereto asked for attorneys' fees as provided by the statute that applied to that type of cause of action. In the instant case the appellees as plaintiffs instituted suit to recover under a fire policy and pleaded for attorneys' fees under the general article for attorneys' fees, article 2226. I see no difference in the basic nature of the suit and, as a matter of consistency and continuity, the rationale applied by this Court in Mutual Life and Group Life should apply in cases similar to this. In my opinion the reasoning employed by the court in Norton is more logical and directly relates the fee to the work actually done by the attorney in the particular case. See also Argonaut Insurance Company v. A.B.C. Steel Products Co., Inc., 582 S.W.2d 883 (Tex.Civ.App.Texarkana 1979, writ ref'd n.r.e.); Flagg Realtors, Inc v. Harvel, 509 S.W.2d 885 (Tex.Civ.App. Amarillo 1974, writ ref'd n.r.e.); and Wisznia v. Wilcox, 438 S.W.2d 874 (Tex.Civ. App.Corpus Christi 1969, writ ref'd n.r. e.).
The majority concludes that the fee awarded by the trial court is not excessive. The majority states that the trial court awarded the sum of $44,893.33 in attorneys' fees which is an amount "equal to approximately one-third" of the plaintiffs' total recovery. The plaintiffs recovered the full policy amount of $134,950.00, and the amount of attorneys' fees awarded by the trial court is precisely one-third of the face amount of the policy. In my opinion the attorneys' fees are excessive based upon the Norton rationale and the trial court's judgment with respect to attorneys' fees should be reformed. The judgment could be reformed by reducing the amount of attorneys' fees awarded for the trial of the case to an amount based upon the *888 reasonable hourly rate that is in evidence multiplied by the number of hours the appellees' attorneys testified they spent in preparing and trying the case. Alternatively, reformation of the attorneys' fees award could be adjusted by requiring a remittitur by appellees' fees in an amount that would cause said fees to be reasonable under the rationale of Norton and its progeny, including consideration of the risk of litigation.
As reformed above I would otherwise agree to affirm the trial court's judgment as set forth in the majority opinion.